**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>vs.                                                     )<br>)<br>JATON EDWARDS,                          )<br>)<br>　　　　　　　Defendant.           )<br>_____) | No. 2:19-cr-00550-DCN-3<br><br>**ORDER** |

　　　　　The following matter is before the court on defendant Jaton Edwards's ("Edwards") motion to suppress evidence, ECF No. 1057. For the reasons set forth below, the court denies the motion.

## I.  BACKGROUND

　　　　　In 2019, the Federal Bureau of Investigation (the "FBI") began conducting court-authorized surveillance on several cell phones in connection with an investigation into a large drug trafficking organization known as the Dorchester Terrace Crew. As part of the surveillance, agents began monitoring voice calls and location data from a cell phone used by Theodore Gadsden ("Gadsden"), a kilogram-level drug supplier to the organization. On February 5, 2019, agents intercepted a series of calls between Gadsden and a male subject using the telephone number 843-801-9592. The male subject using 843-801-9592 was later identified as Edwards.

　　　　　At 11:21 a.m. that day, Gadsden called Edwards and said, "Let me get one man," which the agents believed to be a reference to one kilogram of cocaine. Ex. 2 at 2 (Session 2020). At 11:26 a.m., Edwards called Gadsden and asked for "perc," which the

1

agents believed to be a reference to Percocet.[1]  Id. at 3 (Session 2025); Ex. 3 at 1.  During that call, Gadsden confirmed the price of "one" for $35,500 and noted that the supplier usually shorted "one" by twelve grams to a half ounce.  Ex. 3 at 1.  As a result of the calls, the agents decided to establish a physical surveillance of Gadsden using surveillance units.  The surveillance was conducted by task force officers Jerome De Sheers ("De Sheers") and Jamar Medlin, and South Carolina Law Enforcement Division ("SLED") special agent John Neale.  Id.

At 12:41 p.m., Gadsden called and asked a different unknown male to "meet him and follow him to a deal," and the male subject agreed to follow Gadsden.  Id. at 2.  At 12:52, Edwards called Gadsden and told him to "go to the Arby's, soon as you jump off the I."  Ex. 2 at 17 (Session 2049).  Gadsden responded that he was getting off the exit.  Id.  Following the call, De Sheers drove to the Arby's located at 8089 Rivers Avenue, North Charleston, South Carolina.  Surveillance units observed Gadsden's Nissan Pathfinder and a red Ford pickup truck park in the Arby's parking lot.  Ex. 3 at 2.  Eventually, the unknown subject in the red pickup truck got into the passenger seat of Gadsden's Nissan Pathfinder.  Id.

At 12:55 p.m., Edwards called Gadsden again and told him he was "[p]ulling up . . . right by Arby's."  Ex. 2 at 17 (Session 2051).  At approximately 1:15 p.m., De Sheers observed a man driving a burgundy Lincoln sedan, later identified as Edwards, enter the Arby's parking lot and park his car next to Gadsden's Nissan Pathfinder.  Ex. 3 at 2.  According to the surveillance report, Gadsden got out of the Pathfinder and stayed

---

[1] Percocet is a prescription pain killer that contains acetaminophen and oxycodone in a 325 mg tablet.

between his car and the driver's side of Edwards's Lincoln. Id. During that time, De Sheers was unable to see the driver's side of Edwards's vehicle. Eventually, Gadsden got back into his vehicle, and the other male subject got back into the red pickup truck. Id. Both vehicles left while the burgundy Lincoln remained on scene. Id.

Approximately fifteen minutes later, a black Dodge Journey pulled up next to the passenger side of Edwards's Lincoln. Id. at 3. A man exited the Dodge Journey, opened the passenger door to the Lincoln, leaned into the vehicle, placed an unknown item into his own jacket pocket, and leaned back from the Lincoln. Id. The interaction lasted no more than a few seconds before the man reentered the Dodge Journey. The Dodge Journey then backed out of the parking space and exited the parking lot, followed by the Lincoln. Id. Based on De Sheers's law enforcement training and experience, De Sheers believed he had witnessed a possible narcotics transaction and decided to request a traffic stop of the Lincoln.

De Sheers provided Edwards's vehicle information, his observations, and his conclusions to SLED agent Alex Blake ("Blake"). Blake in turn relayed the information to Deputy Hank Carter ("Carter") of the Charleston County Sheriff's Office and asked Carter to stop the vehicle. De Sheers did not ask Blake to stop any of the other vehicles that he had seen in the parking lot. Upon responding to the area, Carter observed the burgundy Lincoln traveling westbound on Rivers Avenue. Carter saw that the vehicle was outfitted with after-market window tint that did not meet the tint requirements under South Carolina law. Additionally, Carter noticed that the driver was not wearing a seatbelt and failed to properly signal 100 feet prior to changing lanes multiple times. Carter initiated a traffic stop as the vehicle pulled into 7800 Rivers Avenue. Two other

deputies, including Deputy Jeffery Phillips ("Phillips"), arrived at the scene to assist Carter with the stop.

Upon making contact with him, Carter immediately recognized Edwards from multiple previous encounters. Carter advised Edwards of the traffic violations he had observed and requested the necessary driving documents. According to Carter, Edwards began demonstrating signs of nervousness that he had not previously exhibited in their many prior interactions. Carter requested that Edwards exit the vehicle and asked him if there was anything illegal in the vehicle. Edwards responded that he had a firearm inside the glovebox. At that point, Carter radioed in to request that a dispatcher identify whether Edwards was prohibited from carrying a firearm. Carter then asked Edwards if Carter could run a K9 dog around the vehicle, and Edwards consented. Carter deployed his K9 dog, Zeus, who "alerted [Carter] to the rear, driver-side door." ECF No. 1074-3 at 5. Carter advised Edwards that probable cause had been established to search the vehicle.

The officers conducted a probable cause search and identified a black Glock Model 30 .45 caliber semiautomatic handgun containing one round in the chamber and twelve additional rounds in an extended magazine. Officers found a separate magazine containing thirteen rounds in the glovebox. Officers also found a small manila envelope containing approximately twenty-two small, round, white pills that were later identified as 325 mg/10 mg Acetaminophen/Oxycodone. Behind the dashboard, Carter found a purple Crown Royal bag covered in a white, powdery substance. Inside the bag, Carter discovered a clear, plastic baggie containing approximately eighty-nine grams of cocaine, five empty baggies, and a black digital scale covered in a white powdery substance. A

search of Edwards's person revealed approximately $2,768 inside his right front pants pocket.

Carter advised Edwards of his Miranda rights, and Edwards acknowledged that he understood his rights. Following the Miranda warning, Edwards stated that no one else had been inside the vehicle and that it had been parked at his "girl's" house. ECF No. 1074-3 at 5. The Charleston County Sheriff's Office took Edwards into custody and charged him with trafficking cocaine, possession with intent to distribute a Schedule II controlled substance, and possession of a firearm during the commission of a violent crime. While waiting for the Lincoln to be towed, Phillips conducted a vehicle inventory and located approximately $650 in the center console. Id. at 7. After Phillips contacted Carter, Carter advised Phillips that he had forgotten to collect that bundle of cash and requested that it be logged with the rest of the currency. Id.

On February 25, 2020, a grand jury indicted Edwards on six charges: (1) participation in a drug distribution conspiracy, in violation of 21 U.S.C. §§ 841(a)(1) and 846; (2) possession with intent to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C); (3) possession of a firearm in furtherance of drug trafficking, in violation of 18 U.S.C. § 924(c)(1)(A)(i); (4) possession of a firearm by a convicted felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(e); and (5) two counts for the use of communications facilities to facilitate the commission of a felony under the Controlled Substances Act, in violation of 21 U.S.C. §§ 841(a)(1) and 846. ECF No. 230. On August 11, 2020, Edwards entered a plea of not guilty. ECF No. 572.

On June 29, 2022, Edwards filed a motion to suppress evidence. ECF No. 1057. On August 23, 2022, the government responded in opposition. ECF No. 1074. The court

agreed to hold an evidentiary hearing, and on November 28, 2022, the court held the hearing on the motion to suppress. ECF No. 1105. The motion is now ripe for review.

## II.  STANDARD

"The Fourth Amendment provides in relevant part that '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated.'" United States v. Jones, 565 U.S. 400, 404 (2012) (quoting U.S. Const. amend. IV). "Time and again, [the Supreme] Court has observed that searches and seizures conducted outside the judicial process, without prior approval by judge or magistrate are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated exceptions." Minnesota v. Dickerson, 508 U.S. 366, 372 (internal quotation marks and citations omitted).

"The exclusionary rule 'generally prohibits the introduction at criminal trial of evidence obtained in violation of a defendant's Fourth Amendment rights.'" United States v. Stephens, 764 F.3d 327, 335 (4th Cir. 2014) (quoting Penn. Bd. of Prob. & Parole v. Scott, 524 U.S. 357, 359 (1998)). The purpose of the exclusionary rule "is to deter future Fourth Amendment violations." Davis v. United States, 564 U.S. 229, 236–37 (2011). When a defendant challenges a warrantless search or seizure, the government bears the burden of proving by a preponderance of the evidence that the search or seizure was not unreasonable within the meaning of the Fourth Amendment. See United States v. Guerrero-Barajas, 240 F.3d 428, 432 (5th Cir. 2001) ("When the government searches or seizes a defendant without a warrant, the government bears the burden of proving, by a preponderance of the evidence, that the search or seizure was constitutional."); United States v. McGee, 736 F.3d 263, 269 (4th Cir. 2013).

6

### III.  DISCUSSION

Edwards moves the court to suppress all evidence seized from his vehicle on the grounds that the evidence was obtained in violation of his Fourth Amendment rights. First, Edwards argues that the search of his vehicle was not supported by probable cause. Second, Edwards contends that since the traffic stop was not based on reasonable suspicion, the stop was an unconstitutional seizure and the evidence from the subsequent search constitutes "fruit of the poisonous tree."  ECF No. 1057 ¶ 27.  The government disputes both grounds, arguing that Carter had probable cause to search Edwards's vehicle and that Carter conducted a valid traffic stop.  The court evaluates each argument in turn.

#### A.  Probable Cause

It is well-settled that searches conducted outside the judicial process are per se unreasonable unless they fall under a few narrow exceptions.  See Katz v. United States, 389 U.S. 347, 357 (1967).  The government does not dispute that the officers searched Edwards's vehicle without a warrant.  Instead, the government argues that the officers' search of the vehicle was permissible under the automobile exception.  The court agrees, finding that the officers' search was supported by probable cause.  In the alternative, the court finds that the inevitable disclosure doctrine applies.

##### 1.  Automobile Exception

Under the automobile exception, the police can search a vehicle without first obtaining a warrant if they have probable cause to believe the car contains contraband or evidence of illegal activity.  Maryland v. Dyson, 527 U.S. 465, 467 (1999) (per curium). "Probable cause to search a vehicle exists when 'reasonable officers can conclude that

7

what they see, in light of their experience, supports an objective belief that contraband is in the vehicle.'" United States v. Baker, 719 F.3d 313, 319 (4th Cir. 2013) (quoting United States v. Ortiz, 669 F.3d 439, 446 (4th Cir. 2012)).  In other words, "a search is not unreasonable if [it is] based on facts that would justify the issuance of a warrant, even though a warrant has not actually been obtained." United States v. Ross, 456 U.S. 798, 825 (1982).

The parties dispute whether probable cause was established.  Edwards suggests that the search was not supported by probable cause because the dog sniff conducted by Carter was unreliable.  See ECF No. 1057 ¶ 25.  In response, the government argues that probable cause was established even before Carter requested and conducted the dog sniff.  Specifically, the government contends that even if Carter did not independently have probable cause to search Edwards's vehicle for contraband, the "collective knowledge doctrine" established probable cause.

The collective knowledge doctrine arises to answer questions "as to whether probable cause must be established only through the information personally known by the arresting or searching officer, or whether information known by other officers may also be factored into the equation." United States v. Ferebee, 957 F.3d 406, 411 (4th Cir. 2020).  In general, the doctrine "applies when at least some, but not all, of an investigative team has actual knowledge of facts necessary to a finding of probable cause." United States v. Blauvelt, 638 F.3d 281, 289 (4th Cir. 2011) (citing United States v. Wells, 98 F.3d 808, 810 (4th Cir. 1996)).  However, the Fourth Circuit "limits application of the doctrine to cases where the search or arrest is directed by an officer who himself has sufficient knowledge to amount to probable cause." Ferebee, 957 F.3d

at 411 (citing <u>United States v. Massenburg</u>, 654 F.3d 480, 494 (4th Cir. 2011)). Therefore, district courts in this circuit apply the doctrine by substituting the knowledge of the instructing officer for the knowledge of the acting officer before evaluating probable cause.

Here, the evidence supports the conclusion that De Sheers was the directing officer while Carter was the acting officer. As such, it is De Sheers's knowledge that is pertinent to the probable cause inquiry. De Sheers was present in the wire room and reviewed the intercepted phone call between Gadsden and a then-unidentified man in which Gadsden ordered one kilogram of cocaine and the male subject later, later identified as Edwards, requested a quantity of Percocet. De Sheers then personally conducted a physical surveillance of Gadsden's vehicle. After De Sheers was notified by the wire room that Edwards directed Gadsden to meet him at the Arby's off the interstate, De Sheers observed a burgundy Lincoln sedan pull into the parking spot next to Gadsden's Nissan Pathfinder. De Sheers watched as Gadsden exited the vehicle and "stayed between the Nissan Pathfinder and the Lincoln." Ex. 3 at 2. After Gadsden's vehicle left, he observed a black Dodge Journey enter the parking lot and park next to the burgundy Lincoln. The driver of the Dodge Journey leaned into the vehicle and placed an unknown item into his pocket, which he likely received from the man in the burgundy Lincoln.

De Sheers—based on the information he personally gathered, along with his considerable experience and training in narcotics—had probable cause to order an automobile search. Even without considering De Sheers's expertise, an objectively reasonable police officer in De Sheers's position would have believed that contraband

would be found in the burgundy Lincoln. See Ornelas v. United States, 517 U.S. 690, 696 (1996) (describing probable cause as "existing where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found"). Based on the collective knowledge doctrine, as applied in this circuit, De Sheers's probable cause is thus imputed onto Carter, who received the instruction to stop Edwards.

During the evidentiary hearing, Edwards questioned Blake, the intermediary officer, on his level of involvement in the surveillance, intimating that it had been minimal. Edwards also pointed out that De Sheers did not have direct contact with Carter. Edwards appears to suggest that De Sheers could not have been Carter's directing officer for purposes of the collective knowledge doctrine. This argument, however, is unavailing.

Even though De Sheers did not speak directly with Carter, the government has sufficiently established that they were working together in a "vertical" collective knowledge relationship, which is required to establish probable cause. See Massenburg, 654 F.3d at 493–495 (distinguishing a vertical collective knowledge relationship from a horizontal aggregation of information, the latter of which is characterized by an officer's decision to perform a search "in total ignorance of the existence of that information"); accord United States v. Guzman, 2018 WL 7361073, at *6 (N.D. Ga. Dec. 13, 2018) (citing United States v. Ibarra-Sanchez, 199 F.3d 753, 758–59 (5th Cir. 1999)) (finding that the presence of an intermediary between the DEA and the acting officer during an operation "did not render the collective knowledge doctrine inapplicable"); United States v. Johnson, 2016 WL 3693327, at *9 (E.D. Ky. June 30, 2016) ("Adding a third link does

not cause the chain to break."). According to the government, De Sheers decided to request a "walled off" traffic stop, which is "a stop where a local officer pulls over a vehicle and searches it based on an apparently independent basis to protect the integrity of the ongoing federal investigation." ECF No. 1074 at 5. To effectuate the walled-off stop, De Sheers contacted Blake, who in turn requested that Carter conduct a traffic stop. Critically, the decision to order the stop came from De Sheers, and De Sheers may accordingly be characterized as Carter's directing officer. Application of the collective knowledge doctrine is thus proper in this case, and for the reasons discussed above, De Sheers's knowledge supported Carter's probable cause determination.

### 2. Inevitable Discovery

Even if the court were to find probable cause lacking, the court concludes that suppression of the evidence would be improper under the inevitable discovery doctrine. The United States Supreme Court has recognized "the ultimate or inevitable discovery exception to the exclusionary rule," Nix v. Williams, 467 U.S. 431, 444 (1984), which applies when the prosecution can "prove by a preponderance of the evidence: first, that police legally could have uncovered the evidence; and second, that police would have done so," United States v. Alston, 941 F.3d 132, 138 (4th Cir. 2019), cert. denied, 140 S. Ct. 1221 (2020) (emphases in original). "'A finding of inevitable discovery necessarily rests on facts that did not occur,' but 'by definition the occurrence of these facts must have been likely, indeed inevitable, absent the government's misconduct.'" Id. (quoting United States v. Allen, 159 F.3d 832, 840 (4th Cir. 1998)). "[T]he fact making discovery inevitable must 'arise from circumstances other than those disclosed by the illegal search

itself.'" United States v. Thomas, 955 F.2d 207, 211 (4th Cir. 1992) (quoting United States v. Boatwright, 822 F.2d 862, 865 (9th Cir. 1987)).

Here, Edwards argues that Carter—and by extension, De Sheers—lacked probable cause to perform an automobile search. Even without De Sheer's knowledge, however, Carter would have inevitably searched Edwards's vehicle on his own accord. Following Carter's traffic stop, Edwards volunteered to Carter that he had a firearm in his glovebox. Upon learning that information, Carter requested that a dispatcher identify whether Edwards was a felon prohibited from carrying a firearm. To be sure, Carter did not learn the result of the records search before he conducted his dog sniff and search, and Edwards claims the automobile search was unlawful for that reason. However, Carter testified at the hearing that even if he had not performed the search at that time, he would not have allowed Edwards to leave while he was waiting to hear back about the felony-records search. A dispatcher ultimately confirmed that Edwards had a prior felony conviction; thus, Carter would have been permitted to search his vehicle for the firearm at that time. See United States v. Khalaf, 2022 WL 14809433, at *5 (W.D. Va. Oct. 25, 2022) (explaining that probable cause to search the defendant's vehicle was satisfied after the defendant "verbally informed officers that there was a gun in the car and that he was on probation"). "[O]nce police have probable cause, they may search 'every part of the vehicle and its contents that may conceal the object of the search.'" United States v. Kelly, 592 F.3d 586, 590 (4th Cir. 2010) (quoting United States v. Ross, 456 U.S. 798, 825 (1982)). As such, the court concludes that the contraband in Edwards's vehicle would have inevitably been discovered, either through a proper automobile search or following an inventory search.

In summary, the court finds that probable cause was established based on the wiretap and physical surveillance. Even if the court had determined that the information gained from the investigation did not support probable cause, the evidence supports the conclusion that the contraband would inevitably have been discovered. For those reasons, Carter's search was constitutional.

### B. Unlawful Seizure

Edwards also challenges the constitutionality of his seizure and seeks to suppress any evidence that is the fruit of that allegedly unlawful seizure. Edwards challenges his seizure on the grounds that the initial traffic stop was not supported by probable cause and that there was no reasonable suspicion to prolong the traffic stop to conduct a free-air dog sniff. See ECF No. 1057 ¶¶ 25–27 (arguing, inter alia, that "[t]o extend an otherwise completed traffic stop in order to conduct a dog sniff, an officer must have reasonable suspicion that criminal activity is occurring"). Edwards ostensibly presents this argument because Carter stated in his report that he stopped Edwards after observing him commit multiple traffic violations. ECF No. 1074-3 at 5. Even before the traffic violations, however, Blake had already told Carter to stop the vehicle based on the De Sheers's suspicions of criminal activity. Carter testified at the evidentiary hearing that he individually identified reasons for conducting a traffic stop because he was instructed to do so, he was following protocol, and he did not want to tip off Edwards about the FBI's investigation. The court concludes that it need not decide whether Carter improperly performed a traffic stop. Even assuming (without deciding) that the traffic stop was improper, the court finds that the seizure and resulting search were proper because the

detention was nevertheless supported by a reasonable suspicion of criminal activity and thus, Carter was permitted to conduct an investigatory stop.[2]

In Terry v. Ohio, the Supreme Court recognized that an officer may stop and detain a person without probable cause in limited circumstances. 392 U.S. 1, 27 (1968). Following Terry, the Fourth Circuit has held that consistent with the Fourth Amendment, "[a]n officer may stop and briefly detain a person 'when the officer has reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity.'" United States v. Montieth, 662 F.3d 660, 665 (4th Cir. 2011) (quoting United States v. Hensley, 469 U.S. 221, 227 (1985)). Indeed, "it is elementary that the authorities are entitled to stop a moving vehicle reasonably suspected of involvement in smuggling contraband, and they may briefly detain and investigate such a vehicle and its occupants." United States v. Singh, 363 F.3d 347, 355 (4th Cir. 2004); see United States v. Sharpe, 470 U.S. 675, 687–88 (1985) (holding that a stop of a vehicle and subsequent twenty-minute investigatory detention was reasonable where authorities observed circumstances indicative of drug trafficking).

To justify such an investigative stop, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Terry, 392 U.S. at 21. In other words, to be constitutional, an officer may only conduct a brief, investigatory stop when the officer

---

[2] Whether an officer conducted a proper traffic stop and whether he conducted a proper investigatory stop are distinct inquiries. "Observing a traffic violation provides sufficient justification for a police officer to detain the offending vehicle for as long as it takes to perform the traditional incidents of a routine traffic stop." United States v. Branch, 537 F.3d 328, 335 (4th Cir. 2008); see also Whren v. United States, 517 U.S. 806, 813 (1996) (explaining that "the constitutional reasonableness of traffic stops" does not "depend[] on the actual motivations of the individual officers involved").

has a reasonable suspicion that criminal activity is afoot. Illinois v. Wardlow, 528 U.S. 119, 123 (2000). For reasonable suspicion to lie, an officer must be able to articulate more than an "'inchoate and unparticularized suspicion or hunch' of criminal activity." Id. at 123–124 (quoting Terry, 392 U.S. at 27). The reasonable suspicion test is based on the totality of the circumstances. United States v. Perkins, 363 F.3d 317, 319 (4th Cir. 2004); see United States v. Foster, 634 F.3d 243, 246 (4th Cir. 2011) ("[A] court must look to the totality of the circumstances in determining whether the officer had a particularized and objective basis for suspecting criminal activity.").

Importantly, "[t]he collective knowledge doctrine applies equally to the question of reasonable suspicion." United States v. McCullers, 591 F. Supp. 3d 38, 47 n.13 (E.D. Va. 2022), appeal filed (citing United States v. McRae, 336 F. App'x 301, 305 (4th Cir. 2009)); see McRae, 336 F. App'x at 305 ("[U]nder the collective knowledge doctrine . . . , reasonable suspicion may be based on the collective knowledge of the officers involved in an investigation."). Thus, the court must consider De Sheers's knowledge as part of the analysis, and De Sheers's reasonable suspicion to stop Edwards is imputed onto Carter. See McCullers, 591 F. Supp. 3d at 47 n.13. For similar reasons as discussed before, the court finds that De Sheers—and therefore, Carter—had a reasonable and articulable suspicion that Edwards was engaging in criminal activity. Namely, De Sheers obtained evidence that Edwards's vehicle was likely being used for the transport of cocaine and/or Percocet. Edwards's initial seizure was therefore constitutional.

During the Terry stop, "[t]he scope of [a] search must be 'strictly tied to and justified by' the circumstances which rendered its initiation permissible." Singh, 363

F.3d at 357 (quoting Terry, 392 U.S. at 19) (alterations in original). "Where reasonable suspicion exists to support the stop of a moving vehicle, officers are entitled to conduct an investigatory detention to obtain consent to search or to develop probable cause." Id. (citing United States v. Brignoni-Ponce, 422 U.S. 873 (1975)). The court previously determined that probable cause existed for Carter to search Edwards's vehicle. That probable-cause search was strictly tied to and justified by the circumstances that rendered the investigatory stop permissible. Moreover, De Sheers asked for and obtained Edwards's consent to perform the open-air dog sniff, which further led to probable cause. Even if the court found that Carter extended a completed traffic stop to conduct a dog sniff without reasonable suspicion (which it does not), the court finds that the request to conduct the dog sniff was sufficiently tied to and justified by the reasons supporting the investigatory stop. In short, Carter was permitted to conduct an investigatory stop of Edwards's vehicle, and the admission of any evidence derived from the subsequent search of the vehicle does not violate Edwards's Fourth Amendment rights.

## IV.   CONCLUSION

For the reasons set forth above, the court **DENIES** the motion.

**AND IT IS SO ORDERED.**

DAVID C. NORTON
UNITED STATES DISTRICT JUDGE

**December 20, 2022**
**Charleston, South Carolina**